ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLANT

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

---

D.C. Cir. No. 14-5230

---

JEFFERSON MORLEY,

Appellant,

v.

CENTRAL INTELLIGENCE AGENCY,

Appellee

---

James H. Lesar
D.C. Bar #114413
930 Wayne Avenue
Unit 1111
Silver Spring, MD 20910
Phone: (301) 328-5920

Dated: April 20, 2015

Counsel for Appellant

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEFFERSON MORLEY | : |
| | : |
| Appellant, | : |
| v. | : |
| | :     D.C. Cir. No. 14-5230 |
| CENTRAL INELLIGENCE | :     (C.A. No. 03-2545) |
| AGENCY | : |
| | : |
| Appellee | : |

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

JEFFERSONMORLEY, appellant in the above-captioned case,
hereby submits this certificate of counsel as to parties, rulings, and related
cases pursuant to Rule 28 and this Court's order of September 24, 2014.

1. Parties and Amici

No amici appeared in this case below. The parties appearing below
were JEFERSON MORLEY, plaintiff, and the Central Intelligence Agency,
defendant.

2. Rulings under Review

The rulings under review are the District Court's order [ECF 148] and

i

Memorandum Opinion [ECF147] denying plaintiff Morley's Renewed

Motion for an Award of Attorney's Fees and Costs, both entered July 23,

2014.

3. Related Cases

This case has previously been before this Court as D.C. Circuit

12-5032.

James H. Lesar #114413
930 Wayne Avenue, Unit 1111
Silver Spring, MD 20910
Phone: (301)328-5920
Counsel for Appellant

Dated: April 20, 2015

ii

# TABLE OF CASES

Page

<u>Cotton v. Heyman</u>, 63 F.3d 1115 (D.C.Cir. 1995)    15,17

*<u>Davy v. C.I.A.</u>, 550 F.3d 1155 (D.C.Cir.2008)    1,18,19,21,
("<u>Davy</u>")    22,25-27,

<u>Davy v. C.I.A.</u>, 496 F. Supp 36 (D.D.C. 2007)    27
("<u>Davy 2007</u>")

<u>Morley v. U.S.C.I.A.</u>, 453 F.Supp.2d 137 (D.D.C. 2006)    11
("<u>Morley I</u>").

<u>Morley v. U.S.C.I.A.</u>, 508 F.3d 1108 (D.C.Cir. 2007)    11

<u>Morley v. C.I.A.</u>, 699 F. Supp.2d 244 (D.C.Cir. 2010)    13,14,
("<u>Morley III</u>")    16

<u>Morley v. U.S.C.I.A.</u>, 828 F.Supp.2d 257 (D.D.C. 2011)    14,15,23-25,
(" <u>Morley 2011</u>")    28,39

<u>Morley v. C.I.A.</u>, 719 F.3d 689 (D.C.Cir. 2013)    19,21,22,24,
("<u>Morley 2013</u>")    26

*<u>Morley v. C.I.A.</u>, Memorandum Opinion (D.D.C. July 23,    24,30,36,38,
2014) ("<u>Morley 2014</u>")    40

<u>Nationwide Bldg. Maintenance, Inc. v. Sampson</u>,    15,45
559 F.2d 704 (D.C.Cir. 1977)

<u>Tax Analysts v. U.S. Dept. of Justice</u>, 965 F.2d 1092    26
(D.C. Cir. 1992)

U.S. Department of Justice v. Reporters Comm. for      29
Freedom of the Press, 489 U.S. 749 (1989)

\*Cases chiefly relied upon marked by asterisk

## GLOSSARY

| | |
|---|---|
| ARRB | Assassination Records Review Board ("Review Board") |
| Church Committee | Senate Select Committee to Study Government Operations with Respect to Intelligence Activities |
| CIA | Central Intelligence Agency |
| DRE | Directorio Revolucionario Estudantil or Cuban Student Directorate |
| FOIA | Freedom of Information Act |
| FPCC | Fair play for Cuba Committee |
| HSCA | House Select Committee on Assassinations |
| JFK Records Act | President John F. Kennedy Assassination Records Collection Act of 1992 |
| NARA | National Archives and Records Administration |
| Warren Commission | President's Commission on the Assassination of President Kennedy |

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES                                              1

STATUTES AND REGULATIONS                                        3

JURISDICTION                                                    4

STATEMENT OF THE CASE                                           4

    A. THE FOIA REQUEST AND ITS SIGNIFICANCE        4

    B. THE CIA'S VIOLATION OF ITS STATUTORY
       DUTY TO RESPOND TO THE REQUEST              6

    C. INITIAL PROCEEDINGS IN DISTRICT COURT        7

    D. FIRST APPEAL                                 11

    E. FIRST REMAND TO DISTRICT COURT               11

    F. FIRST MOTION FOR ATTORNEYS' FEES             13

        1. INITIAL PROCEEDINGS                      13

        2. THE DISTRICT COURT'S 2011 DECISION
          DENYING ATTORNEY FEES                  14

    G. FIRST ATTORNEY FEES APPEAL                   19

    H. FIRST ATTORNEY FEES REMAND                   19

SUMMARY OF ARGUMENT                                             20

ARGUMENT                                                        24

    1. THE DISTRICT COURT VIOLATED THIS COURT'S

vi

|  | Page |
|---|---|
| INSTRUCTIONS BY APPLYING THE FOUR-FACTOR STANDARDS INCONSISTENTLY WITH <u>DAVY</u> | 24 |
| A. THE DISTRICT COURT'S REMAND INSTRUCTIONS | 24 |
| B. THE PUBLIC BENEFIT FACTOR | 26 |
| 1. EFFECT OF THE LITIGATION | 26 |
| 2. THE POTENTIAL PUBLIC VALUE OF THE INFORMATION SOUGHT | 30 |
| C. THE SECOND AND THIRD FACTORS | 42 |
| D. THE REASONABLENESS OF THE AGENCY'S CONDUCT | 43 |
| II. THIS COURT SHOULD EXERCISE ITS <u>DE</u> <u>VOVO</u> JURISDICTION BY DIRECTLY AWARDING ATTORNEY FEES AND COST UPON APPLICATION BY MORLEY | 44 |
| CONCLUSION | 46 |

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

———————————

D.C. Cir. No. 14-5230

———————————

JEFFERSON MORLEY,

Appellant,

⠸

v.

CENTRAL INTELLIGENCE A ENCY,

Appellee

———————————

On Appeal from the United States District Court for the
District of Columbia, the Hon. Richard J. Leon, Judge

———————————

BRIEF FOR APPELLANT

———————————

STATEMENT OF ISSUES

1.  Whether the District Court's latest denial of an award of attorney
fees in this case is inconsistent with this Court's remand mandating that the
District Court "apply the four-factor standard in a manner consistent with
Davy [v. C.I.A., 550 F.3d 1155 (D.C.Cir. 2008)]."

2. Whether the District Court's decision ruling ignored or erroneously evaluated evidence that

(a) Morley obtained new information in the form of the release of the Career Intelligence Medal awarded to CIA case officer George Joannides, initially withheld by the CIA in 2004 but ultimately released in 2008, which showed approval of Joannides' handling of the DRE at a time when he was the DRE's case officer and Lee Harvey Oswald was in contact with that organization;

(b) Morley obtained other new information in the form of a photograph of Joannides and travel records of Joannides released in 2004 which showed his travel to and/or residences in New Orleans and Miami at times of interest to Kennedy assassination researchers;

(c) after the CIA was ordered to search its operational files on Joannides, it officially and publicly provided new information which acknowledged that Joannides had been working "undercover" at the time he served as the CIA's liaison with the House Select Committee on Assassinations, thus violating the CIA's Memorandum of Understanding with the congressional committee and the United States Criminal Code, 18 U.S.C. § 1505; and

(d) these disclosures have resulted in extensive coverage in at least thirty news outlets in the United States, including Fox News, the New York Times, Washington Post, Boston Globe and the Associated Press.

(3) Morley obtained more than a thousand pages of JFK assassination-related records which the CIA had initially refused to process pursuant to his FOIA request, and did so only after (a) he prevailed on this issue in this Court and (b) the CIA did not charge search or copying fees for the records; and

(4) the CIA officially disclosed for the first time that despite the passage of five decades, more or less, it continues to withhold in its entirety 295 operational records relating to Joannides.

(5) Whether this Court should exercise its power of <u>de novo</u> review to directly award attorney fees and costs in this case rather than remanding it once again to the District Court.

## STATUTES AND REGULATIONS

The attorney fees provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(E) states:

> (i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this

section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1292(a). The trial court had jurisdiction under 5 U.S.C. § 552(a)(4)(B).

## STATEMENT OF THE CASE

A. The FOIA Request and Its Significance

On July 4, 2003, appellant Jefferson Morley ("Morley") submitted a Freedom of Information Act ("FOIA") request to the Central Intelligence Agency ("CIA") for "all records pertaining to CIA operations officer George Efythron Joannides . . . " See Complaint, Exhibit 1 [ECF 1-1]. Among other career assignments, Joannides had served as case officer in charge of the Directorio Revolucionario Estudantil ("DRE" or "Cuban Student

Directorate"), a Cuban exile organization financed and managed by the CIA. His stewardship in that position coincided with a critical 17-month period from November 1962 to April 1964 which includes the assassination of President John F. Kennedy ("JFK assassination").

In the months prior to the assassination, alleged assassin Lee Harvey Oswald ("Oswald") was in contact with officers of the DRE. Although the Oswald/DRE relationship raised questions pertinent to the investigation of President Kennedy's murder, the CIA withheld Joannides' identity and other pertinent information from official investigative bodies, including the President's Commission on the Assassination of President Kennedy ("Warren Commission"), the Senate Select Committee to Study Government Operations with Respect to Intelligence Activities ("Church Committee"), and the House Select Committee on Assassinations ("HSCA"). The CIA also initially concealed this information from the Assassination Records Review Board ("ARRB" or "Review Board"), even though it was obligated by statute, the President John F. Kennedy Assassination Records Collection Act of 1992 ("the JFK Records Act") to locate and disclose such materials. Eventually, however, through Morley's efforts, the ARRB belatedly discovered that Joannides had been the DRE's case officer at the time

Oswald was in contact with it. Disclosure of Joannides' identity by the

Review Board laid the basis for Morley's FOIA request.

## B. The CIA's Violation of Its Statutory Duty to Respond to the Request

The CIA was by statute to make a determination of the request within

20 working days of the time it was received. It violated this fundamental

statutory provision. Three months after the request, the CIA at last

acknowledged receipt of the request. But it did not make a legally required

determination of it. Instead, it advised Morley that "CIA records on the

assassination of President Kennedy have been re-reviewed under the

classification guidelines for assassination-related records of [the JFK

Records Act]" and that "[t]hese records have been transferred to the National

Archives and Records Administration ("NARA") in compliance with this

Act." Id. Exh. 2. [JA 32-33] This response misrepresented (1) the scope of

Morley's request, which was for records on CIA Officer Joannides, not just

JFK assassination-related records; (2) the fact that all JFK assassination-

related documents pertaining to Joannides had been transferred to NARA,

when in fact the CIA retained copies or originals of these records. In

addition, the CIA's response ignored its obligations to process a properly-

made FOIA request rather than foist it on to another agency.

The CIA further advised Morley that these records had been "re-reviewed by the Presidentially-appointed Assassination Records Review Board ("ARRB" or "Review Board")," after which they were returned to NARA to be made available to the public."  Id. This repeated the misrepresentation that NARA rather than the CIA had the responsive records.  The CIA then brushed off Morley's request, telling him that he should submit it to NARA.  Id.  The CIA did not assert that all records responsive to Morley's request had been transferred to NARA.  In fact, they had not been.  Nor did the CIA assert that it had not retained copies or the originals of the JFK assassination-related records transferred to NARA.  In fact, it did retain them.

C.  Initial Proceedings in District Court

Having exhausted his administrative remedies, Morley filed suit on December 16, 2003. The CIA moved for an extension of time to file an answer, stating that based on its response to the request, "it appears that the subject of plaintiff's FOIA request is associated with the investigation of the assassination of President Kennedy," and, "[a]s a result, this matter potentially raises sensitive issues and information which has previously been the subject of other FOIA requests."  In view of this, it asserted that

"responding to the complaint requires more than the ordinary investigation and review." [ECF 3]

On February 19, 2004, the CIA filed its answer. [ECF 6] The answer wrongly denied that its response to Morley's request (1) "did not assert that all records responsive to Morley's request had been transferred to NARA," Answer, ¶ 6; and (2) it did not advise Morley that he had a right to appeal its adverse determination of his request. Id. ¶ 7. It also wrongly denied Morley's allegation, Complaint, ¶ 7, that he had exhausted his administrative remedies.

On April 9, 2004, the CIA moved to stay proceedings. [ECF 7] On September 2, 2004, the District Court entered a Minute Order which granted a stay but ordered that the CIA would have until "December 2004 to complete its processing of [Morley's] FOIA case request. . . ." [ECF 22] The Minute Order also directed the CIA to file status reports by September 30 and December 15, 2004. In its September 30 report [ECF. 24], the CIA stated that it was "currently working with three of its mainline divisions to determine whether responsive documents exist which have not been previously been (sic) disclosed pursuant to the [JFK Records Act]." It identified those divisions as "(1) the Directorate of Operations; (2) the Director of Central Intelligence Area; and (3) the Mission Support Office."

Id. It further advised that "[a]s of the filing of this status report, the Directorate of Operations has completed its search and responded that no responsive records have been located which have not already disclosed (sic) as part of the releases made under the [JFK Act]. The remaining divisions have not yet completed their searches." Id.

The CIA's December 15, 2004 status report stated that the "CIA has nearly completed its processing of all documents responsive to plaintiff's request and is currently reviewing them to ensure consistency in its processing. CIA expects to complete that process and release all non-exempt documents to plaintiff's counsel no later than December 24, 2004." Id.

By letter dated December 22, 2004, more than a year after Morley brought suit, Mr. Scott Koch, then the CIA's Information and Privacy Coordinator, advised Morley's counsel that the CIA was releasing three documents in their entirety and 112 documents in part. [JA 181] Mr. Koch stated that the CIA had "also located additional material, which we have determined is properly classified and must be denied in its entirety on the basis of FOIA exemptions (b)(1), (b)(3), and (b)(6)." However, "[w]ith respect to that portion of your request seeking records regarding Mr. Joannides's participation in any covert project, operation, or assignment,

unless of course previously acknowledged, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request." Id.

In addition to invoking the "Glomar" defense, the CIA further advised that "[d]uring our searches, we also identified two documents that require this Agency to consult with another federal agency. Once the consultation process is complete, this Agency will provide a supplemental response concerning those documents." Id. at [JA 182]. Finally, Koch advised that "78 documents on [the subject of Joannides] had previously been released under the [JFK Records Act]" and "are available to the public at the National Archives." Id. This once again denied Morley right to obtain under FOIA copies of CIA records which were also at NARA. The CIA insisted once again on shifting the burden of producing any records processed under the JFK Act that were responsive to Morley's request off its shoulders and onto Morley and the National Archives.

Given the facts detailed above, the direct result of the filing of the complaint was the production and release of a large number of documents which had not been previously released under the JFK Act. In addition,

documents which were "new records" on Joannides, the subject of his

request,[1] that had not previously been released under the JFK Act.

Subsequent to these releases, the parties cross-moved for summary

judgment. By order issued September 29, 2006, the District Court granted

the CIA's motion and denied Morley's. Morley v. U.S. C.I.A., 453

F.Supp.2d 137 (D.D.C. 2006) ("Morley I").

D. First Appeal

Morley appealed. This Court remanded the case to the District court.

It instructed that "[o]n remand, the district court shall direct the CIA to

search its operational files and the records released to NARA and to

supplement the description of its search and the explanation for withholding

material pursuant to Exemptions 2, 5, and 6. It further ordered the district

court to make the requisite segregability determinations." Morley v. C.I.A.,

508 F.3d 1108, 1129 (D.C.Cir. 2007).

E. First Remand to District Court

On remand, the CIA released still more records. By letter dated April

28, 2008, from AUSA John C. Truong, it stated that, as ordered by this

---

[1] Despite the CIA's persistent effort throughout this litigation to paint the subject of Morley's request as solely related to the JFK assassination, its answer acknowledges otherwise: "Plaintiff [is] generally 'seek[ing] information pertaining to a deceased former official of the [CIA] George Efythron Joannides.'" Answer, ¶2, quoting Morley request.

Court, it had searched the JFK-related records that it had previously transferred to NARA, and that this search had located 113 records, totaling 1,040 pages, which were responsive to Morley's FOIA request. The CIA stated that it was releasing 88 of these documents in full and 25 in part. See April 29, 2008 Joint Status Report at 1. [ECF 78] This figure conflicted with the CIA's previous representation that there were "78 documents" (of an unspecified number of pages) which had previously been released under the JFK Act. See December 22, 2004 Scott Koch letter, supra. [JA 286]

In addition, the CIA also released 11 re-redacted documents which initially withheld biographical information on Mrs. Joannides even though she was deceased.

Subsequently, by letter dated August 6, 2008, from Delores M. Nelson ("Nelson"), the CIA's Information and Privacy Coordinator, the CIA stated that it was releasing 29 documents in their entirety; it also partially released information in 264 other documents. Letter from Nelson to Lesar. [JA 298] Nelson further stated that the CIA had located "additional material that is properly classified and must be denied in its entirety pursuant to Exemptions 1, 2, 3, 5 and 6."

With respect to Morley's request seeking materials pertaining to Joannides' "participation in any covert project, operation, or assignment,"

Nelson asserted that the CIA could neither confirm nor deny the existence or nonexistence of such records. Id. She also said that CIA had located material that was not originated by the CIA and was being referred by it to the originating agency for direct response by said agency.[2] Nelson Decl. Exh. E. [JA 298]

Finally, with respect to Morley's request seeking materials pertaining to Joannides' "participation in any covert project, operation, or assignment," Nelson asserted that the CIA could neither confirm nor deny the existence or nonexistence of such records. Id.

Subsequent to these releases, the CIA filed a Renewed Motion for Summary Judgment [ECF 88] and Morley filed a Renewed Cross-Motion for Summary Judgment. [ECF 95] By order entered on March 31, 2010 the District Court granted the CIA's motion for summary judgment and denied Morley's. Morley v. U.S.C.I.A., 699 F.Supp.2d 244 (D.C.Cir. 2010) ("Morley III").

F. First Motion for Attorneys' Fees

1. Initial Proceedings

---

[2] By letter dated August 18, 2008, the FBI released a two-page document with minor redactions.

Following the decision in <u>Morley III</u>, Morley, on June 1, 2010, moved

for an award of attorney's fees and costs pursuant to 5 U.S.C.

§ 552(a)(4)(E). [ECF 107]  The CIA filed its opposition on July 2, 2010.

[ECF 109]  Further briefing on the attorney fees issue continued until

October 28, 2010.  In the meantime, on May 27, 2010, Morley took an

appeal of the decision on the merits in the underlying case [ECF 105],

Morley appealed the merits decision, which was placed into mediation by

this Court.  Two days after the mediation ended, on December 14, 2011, the

District Court denied the pending motion for an award of attorney's fees.

See <u>Morley v. U.S.C.I.A.</u>, 828 F.Supp.2d 257 (D.D.C.2011)("<u>Morley</u>

<u>2011</u>").

    2.  <u>The District Court's 2011 Decision Denying Attorney Fees</u>

The District Court noted in its decision denying an award of

attorney's fees that a FOIA plaintiff who seeks an award of attorney fees

must show (1) that he is eligible for fees, and (2) that he is entitled to fees.

<u>Id.</u>, 688 F.Supp. 2d at 261.  Noting that the CIA did not contest Morley's

eligibility for an award of fees, the District Court stated that "[b]ecause I

agree with the CIA that Morley is not entitled to attorney's fees, I need not,

and will not, analyze whether Morley is also eligible for an award." <u>Id</u>. at

261 n.2.

At the outset, the District Court emphasizes that "the legislative

history of section 552(a)(4)(E) evinces a clear congressional intent to leave

(sic) the courts' broad discretion when considering a request for attorney

fees." Id. at 261(quoting Nationwide Bldg. Maintenance, Inc. v. Sampson,

559 F.2d 704, 714 (D.C.Cir. 1977) (presumably omitting the word "to" after

the word "leave"). The Court then proceeds to discuss the facts and criteria

pertinent to a determination of whether Morley is entitled to an award of

fees.

The District Court stated that "[i]n determining whether a FOIA

litigant is entitled to fees, a court must consider the following four, non-

exhaustive factors: '1) the public benefit derived from the case; 2) the

commercial benefit to the plaintiff; 3) the nature of the plaintiff's interest in

the records; 4) whether the government has a reasonable basis for

withholding the requested information.'" Morley V, (referred to in this brief

as Morley 2011) 828 F.Supp.2d at 261, quoting Cotton v. Heyman, 63 F.3d

1115, 1117 (D.C.Cir. 1995) (internal citations omitted).

In addressing the first, "public benefit factor, the District Court

conceded that Morley had requested records on Joannides to gain

information about the Kennedy assassination, and it also acknowledged that

"the Kennedy assassination is surely a matter of public interest." But it

dismissed the applicability of these considerations to this case, stating that "this litigation has yielded little if any public *benefit*—certainly an insufficient amount to support an award of attorney's fees." Id. (emphasis in original) at 262.

In support of this "finding," the District Court stated that in response to this Court's decision in <u>Morley III</u>, in 2008 the CIA conducted additional searches which produced "113 documents from the set of documents previously transferred to NARA . . . and 293 documents from the CIA's operational files related to Joannides' personnel records." Id. Stating that "Morley appears to claim that the public benefit in these releases "primarily derives from the Kennedy assassination documents," the Court flatly asserted that "[t]his litigation did not, however, lead to the publication of the Kennedy-assassination documents." Id. "Instead," the Court said, "the Kennedy assassination documents obtained by Morley through this FOIA litigation are *identical* to the documents which were previously released under the [JFK Records Act] and were already in the public domain." Id. (Emphasis in original) at 262-263.

Because the JFK-assassination-related records had been placed in the JFK Act Records Collection at NARA, the Court found that "Morley cannot claim that any of this information 'add[s] to the fund of information that

citizens may use in making vital political choices.'" Id. at 263, quoting

Cotton, 63 F.3d at 1120 (footnote omitted).  Responding to Morley's

argument that NARA normally requires the requester to do the search and

imposes exorbitant copying charges, the Court asserted that "Morley's using

FOIA to sidestep these copying costs and to compel the CIA to search these

records did not exactly further the public benefit." Id. (citation omitted).

Thus, the Court concluded that "considering that Morley has himself

benefitted by avoiding the copying costs, this Court does not view a further

award of attorney fees as appropriate in this case." Id.

The Court went on to find that "[e]ven if the majority of documents

Morley received had not been previously public, Morley's claims about the

supposed public benefit of the documents produced in this litigation are

unconvincing as based on nothing more than his own conclusory opinions

and factually inaccurate statements" Id.  With respect to Morley's statement

that this lawsuit prompted the CIA to acknowledge for the first time that

Joannides had worked in a covert and deceptive capacity as the CIA's

liaison to the HSCA, the Court states that the CIA had "previously

acknowledged this fact when it released records under the JFK Act." Id. at

264, citing Nelson Decl., ¶¶ 16, 59-60. [JA 211, 232]  But neither the Court

nor Nelson point to any specific documents reflecting this acknowledge-

ment, much less show that the acknowledgement was broadcast to the
general public.

With respect to Morley's statement that his lawsuit forced the CIA to
disclose that Joannides received a medal for his work in 1963 and 1978, the
Court dismisses this, saying that "Morley overstates this medal's importance
to his case as in fact this was a 'Career Intelligence Medal' awarded for
Joannides's 28 years of service from 1950-1978." Id. at 264

With respect to the second and third factors—commercial benefit and
the nature of plaintiff's interest in the records—the Court found that Morley
had an interest in obtaining the NARA records from the CIA at little or no
cost "to avoid expending his own time and money to obtain the documents
from NARA." Id. Accordingly, the Court concluded that the second and
third factors "indicate that Morley had a sufficient private interest in
pursuing these records without attorney's fees." Id., quoting Davy v. C.I.A.,
550 F.3d at 1160.

With respect to the fourth entitlement factor, the Court found that the
CIA had colorable basis in law for its withholdings, and that "there is no
indication in the record the CIA has engaged in any recalcitrant or obdurate
behavior." It ruled that the fourth factor "also weighs strongly in favor of
the CIA." Id.

### G. First Attorney Fees Appeal

Morley appealed the District Court's denial of his motion for an award of fees. This Court vacated and remanded with instructions to apply the four-factor standard governing entitlement to attorney fees in a manner consistent with Davy v. C.I.A., 550 F.3d 1155 (D.C. Cir. 2008)("Davy"), a case in which this Court "elaborated on one of the four factors, the public benefit factor." Morley v. C.I.A., 719 F.3d 689 (D.C.Cir. 2013)("Morley 2013").

### H. First Attorney Fees Remand

On September 25, 2013, Morley filed a Renewed Motion for an Award of Attorney's Fees and Costs in the District Court. [EC 135]. The CIA opposed it. [ECF 139] Morley filed a reply [ECF 140] and supplemental memorandum. [JA 141, 142] On July 23, 2014, the District Court denied the motion. July 23, 2014 Memorandum Opinion ("Morley IV") On September 19, 2014, Morley noticed this appeal. [JA 810]

## ARGUMENT

## SUMMARY OF ARGUMENT

This suit was instituted by author/journalist Jefferson Morley to obtain access copies of all records pertaining to George Joannides in the possession or subject to the control of the CIA. As a result of his distinguished career,

Joannides was awarded a Career Intelligence Medal after his retirement.
While much of Joannides' career remains shrouded in secrecy—295
documents from the CIA's operational files on Joannides remain withheld in
their entirety—this lawsuit has resulted in very substantial disclosures about
two phases of his career. The first is the period from November 1962 to
April 1964. During this period Joannides was case officer for the DRE
("Directorio Revolucionario Estudantil" or "Cuban Student Directorate"), a
major Cuban exile organization heavily financed by the CIA. Oswald was in
touch with the DRE in the months prior to the assassination of President
Kennedy.

The widespread public interest is evidenced by extensive coverage of
Morley's lawsuit in geographically and politically diverse news
organizations across the United States. The independent editorial decisions
of these reputable news organizations and news reporters testify
overwhelmingly to the public benefit of the information forced into the
public record by Morley's suit.

The second period of time occurs in 1978 when Joannides was
brought out of retirement to act as liaison between the CIA and the House
Select Committee on Assassinations ("HSCA"). In that capacity there was
an exceptionally strong conflict of interest on Joannides part. He had vital

information that was of great interest to the HSCA in its investigation into the relationship between Oswald and the DRE. The HSCA wanted to know who the DRE's case officer had been at the time Oswald associated with it. Joannides had been the case officer, so he knew. But he didn't tell. The HSCA wanted to obtain relevant documents on DRE. Joannides didn't provide them. Most importantly, as a result of Morley's lawsuit the CIA has stated that he was working "undercover" during this period when he was undermining the probe of the HSCA into the assassination of President Kennedy. This disclosure raises enormously troubling public concerns not only about the subversion of the integrity of the last official committee to probe the assassination of President Kennedy, but about other congressional committees as well.

The foregoing provides the contextual background for this Court's 2013 decision vacating the District Court's prior denial of attorney fees because of its failure to properly apply the four factor standard governing entitlement to attorney fees in FOIA cases. This Court instructed the District Court to apply the four-factor standard in a manner consistent with Davy v. C.I.A., 550 F.3d 1155 (D.C. Cir. 2008)("Davy"). In so doing, this Court noted that in Davy it had "elaborated on one of the four factors, the public benefit factor." Morley v. C.I.A., 719 F.3d 689, 690 (D.C.Cir.

2013)(per curiam) ("Morley 2013"), citing Davy v. C.I.A. ("Davy"), 550
F.3d 1155 (D.C.Cir. 2008).

The District Court's new attempt to apply Davy is inconsistent both
with Davy's elucidation of the "public benefit" factor and the other parts of
the four-factor test.  The first time the District Court considered Morley's fee
application, it asserted that his lawsuit "did not lead to the publication of the
Kennedy assassination documents." Morley 2011, 828 F.Supp.2d 257.
" Instead," the Court said, "the Kennedy assassination documents obtained
by Morley through this FOIA litigation are *identical* to the documents which
were previously released under the [JFK Records Act] and were already in
the public domain." Id. (emphasis in original) at 262-263.  The District
Court does not expressly state that this was in error.  However, it does note
that in support of his claim that the public benefit factor weighs in his favor,
Morley "emphasizes four records that were *not* previously publicly
available," July 23, 2014 Memorandum Opinion ("Mem. Op.") at 7
(emphasis in original).  [JA 805] And it subsequently acknowledges that
"[t]he CIA does not dispute that these four records convey newly-released
information not already in the public domain."

Thus, the factual "findings" upon which Morley 2011 rested are
drastically different from those set forth as uncontested in the District

Court's opinion in Morley 2014. One would expect in light of this substantial difference that there would be at least some change in the weight that the District Court assigned to the public benefit factor. Yet the District Court explicitly states that this marked change in facts made no difference whatsoever in his evaluation of the public benefit factor: "Further consideration of our Circuit's elaboration on the public benefit factor in Davy, however, does not alter my original conclusion that 'this litigation has yielded little, if any, public benefit—certainly an insufficient amount to support an award of attorney's fees'." Id. at 5, quoting Morley 2011, 828 F. Supp. 2d at 262.

The District Court's evaluation of the public benefit factor is devoid of discussion of the significant dissemination of articles in the news media of materials obtained by Morley as a result of his lawsuit. Similarly, Morley 2011 rejected Morley's claim that his suit benefitted the public because the CIA acknowledged for the first time that Joannides was acting in an official and deceptive capacity in his role as liaison to the HSCA. The Court omits that baseless rejection in Morley 2014. But this is surely a matter weighs in Morley's favor where the public benefit factor is concerned.

The District Court does not focus on the issue of whether the records obtained by Morley are of benefit to the public because they add to the fund

of knowledge about issues of public concern; rather, it once again relies

upon its own determination as to what the truth is regarding those issues.

This is a deeply flawed analysis of what Davy holds.

Although this Court instructed the District Court to evaluate the four-

factors, Morley 2014 simply adopts the conclusions set forth in Morley 2013

without any discussion or substantiation. With respect to the fourth factor,

for example, the Court did not address the element of obdurate behavior

which occurred when the CIA did not timely respond to the statutory

deadline for making a determination of a FOIA request.


## ARGUMENT

### I. THE DISTRICT COURT VIOLATED THIS COURT'S INSTRUCTIONS BY APPLYING THE FOUR-FACTOR STANDARD INCONSISTENTLY WITH DAVY

#### A. The District Court's Remand Instructions

In Morley 2013, this Court remanded this case to the District Court to

determine anew of whether Morley is entitled to an award of attorney fees

because his FOIA request successfully obtained "records related to CIA

officer George E. Joannides" ("Joannides"). Morley 2013, 719 F.3d at 690.

The Court noted that "as a result [of filing suit Morley] subsequently

received some records from the CIA, but that the District Court had denied

that Morley was entitled to attorney fees. Morley's litigation victory in the

quest for records and information entitled him to an award of fees if the

District Court evaluated the four factors governing entitlement to fees as

favoring such an award. However, in "[a]pplying those four factors, the

District Court determined that Morley should not receive attorney's fees."

Id. at 690, citing Morley 2011 at 261.

Considering Morley's appeal Morley 2011, this Court noted that it

"recently elaborated on one of those four factors, the public benefit factor,

which looks to the public benefit derived from the plaintiff's FOIA suit."

Id., citing Davy, 550 F.3d 1155 (D.C.Cir. 2008). The Court noted the

parallels between Davy and this case: "In Davy, this Court said that 'records

about individuals allegedly involved in President Kennedy's assassination[]

serve[] a public benefit." Id., quoting Davy at 1159. It continued.

> We also noted that the standard for entitlement
> to attorney's fees does not 'disqualify plaintiffs who
> obtain information that, while arguably not of im-
> mediate public interest, nevertheless enables future
> research ultimately of great value and interest, such
> as here the public understanding of a presidential
> assassination.' Id. at 1162 n.3. We concluded,
> moreover, that, 'a balancing of the factors can only
> support the conclusion that Davy is entitled to an award
> of attorney's fees.' Id. at 1163.

Id. Finding that the District Court "did not consider the Davy Court's

public benefit factor (citing <u>Morley 2011</u> at 262-64), this Court vacated the District Court's denial of fees and remanded the case with instructions "to apply the four-factor standard in a manner consistent with <u>Davy</u>." <u>Id</u>.

Given this Court's repeated analogies between the issues and results in <u>Davy</u> and in this case, it is counterintuitive that a fresh analysis by the District Court of the public benefit standard would <u>not</u> reach a conclusion opposite to that in <u>Davy</u>. Nevertheless, applying a unique and ill-founded analysis of <u>Davy</u>, the District Court ruled that despite the great similarities between the facts and issues in <u>Davy</u> and those in this case, a completely different result was required. Review of the District Court's opinion and the CIA's full-fledge endorsement of it undermine the District Court's attempt to use <u>Davy</u> as the basis for denying an award of attorney's fees to Morley.

B. The Public Benefit Factor

<u>Davy</u> states that the first of the four-factors, the public benefit factor, "assesses 'the public benefit derived from the case', <u>Tax Analysts V. U.S. Department of Justice</u>, 965 F.2d 1093 (D.C. Cir 1992), and requires consideration of both the effect of the litigation for which fees are requested and the potential public value of the information sought.'" <u>Morley 2013</u>, quoting <u>Davy</u> at 1159.

1. Effect of the Litigation

Davy's discussion of this first element of the public benefit test noted that the "District Court found that 'Davy's FOIA request and subsequent litigation were intended to compel disclosure of information relating to the activities of a government agency (the CIA) in relation to a significant historical event,' and thus that this factor favors Davy." Davy at 1159, quoting Davy v. C.I.A., 496 F.Supp.2d 36, 38 (D.D.C. 2007), This is essentially all that Davy 2007 had to say about the public benefit factor except to note that "it is generally satisfied if the plaintiff's victory is likely to add to the public fund of information that citizens may use in making vital political choices." Id. (citation of two D.C. Circuit cases omitted). The District Court did not focus on the interpretation of the content and meaning of the documents released or the potential public value of the information sought. Reviewing this disposition of the public benefit factor in Davy, this Court said: "There can be little doubt that this factor favors Davy." Davy at 1159.

In Morley 2014, the District Court all but ignores the effect of the litigation as a matter to be weighed. It states, "Morley emphasizes four records not previously publicly available to support his claim that the public benefit factor weighs in his favor." Id. at 7 (emphasis in original). [JA 805] Later, it admits that "[t]he CIA does not dispute that these four records

convey newly-released information not in the public domain." Id. at 9
(emphasis added).   [JA 807]

This is completely at odds with his finding in Morley 2011 that
Morley's lawsuit "did not lead to the publication of the Kennedy
assassination documents." Morley 2011, 828 F.Supp.2d  257.  "Instead," the
Court said, "the Kennedy assassination documents obtained by Morley
through this FOIA litigation are *identical* to the documents which were
previously released under the [JFK Records Act] and were already in the
public domain." Id. (emphasis in original) at 262-263.  This represents a
major change in the status of the "facts" relevant to the public benefit
analysis.

Logically, if there is no longer any dispute that Morley's lawsuit
produced new information not previously released to the public, this in some
degree weighs in Morley's favor where the public benefit factor is
concerned.  Yet the District Court is adamant that it did not: "Further
consideration of our Circuit's elaboration on the public benefit factor in
Davy, however, does not alter my original conclusion that 'this litigation has
yielded little, if any, public benefit—certainly an insufficient amount to
support an award of  attorney's fees'." Id. at 5, quoting Morley 2011, 828 F.

Supp. 2d at 262. He never indicates that this change in facts favors a public

benefit finding in Morley's favor.[3]

Davy noted that "nothing in the record indicates that the releases were

not a fruit of Davy's litigation. . . ." Davy at 1159. The same is true here.

As in Davy, all the records released here were made available after no

releases had been made before the filing of the complaint and only after a

court order set a schedule for release.

In addition, all of the records were released to Morley free of either

search fees or copying costs. This was obviously an admission by the CIA

that release of the documents was in the public interest.

In considering the public benefit factor, the District Court did not take

into account the fact that the CIA did not charge Morley search fees or

copying costs. The CIA was obligated to charge him such fees unless he

was entitled to a waiver. Yet it charged him nothing. All fees were in effect

waived for all searches and all copying costs. The fundamental purpose of

the FOIA is to assist citizens in discovering "what their government is up

to." U.S. Department of Justice v. Reporters Comm. for Freedom of the

---

[3] Indeed, he only mentions this concession in the context of seeking to erode
it by considering not as it relates to the first element, impact of the litigation,
but as it relates to the second element, the potential public value of
information sought.

Press, 489 U.S. 749, 773 (1989) (internal quotations and citations omitted) (emphasis in original). The CIA recognized the public benefit achieved by Morley when, after he filed this lawsuit, it released documents to him without charge. Morley achieved an important public benefit by obtaining these records without charge as that permitted him to disseminate them to a much wider public. As the record before the District Court reflects, the dissemination of this information by Morley and others is demonstrated by an abundance of news stories regarding the significance of the records obtained by Morley. The public interest is not gauged by whether they provide specific support for a particular theory but by the fact that the disclosures enable the public to be informed about government actions on an issue or issues of interest to the public.

    2. The Potential Public Value of the Information Sought

    In Morley 2014, the District Court dismissed the public benefit conferred by news coverage of the controversy in a footnote. He notes that Morley argues that the news media "has shown interest in the disclosed records," but also says that "he fails to tie that coverage to any of the newly-released documents rather than those that were already available to the public." Morley 2014 at 10 n.7. [JA 208]

This represents a carryover from the District Court's 2011 opinion and is not based on fact. Morley's argument that this material would benefit the public was ratified by the judgment of the many news organizations which ran articles about the lawsuit and the information it uncovered, including the photograph of Joannides obtaining the Career Intelligence Medal. In every instance, this news coverage raised the question of whether the documents has been properly withheld and questioned the claim that they are unrelated to JFK's assassination.

For example:

On November 22, 2013, the 50th anniversary of JFK's assassination, Fox News correspondent James Rosen published a news story highlighting the significance of the information obtained by Morley's lawsuit. The story began:

> Fifty years after shots rang out in Dealey Plaza, killing a larger-than-life figure and abruptly ushering in what one historian has called "the decade of shocks" - from Dallas to Watergate - the federal agency that stood at the center of seemingly all the intrigues and conspiracy theories of that shadowy era is still holding onto an estimated 1,100 documents relating to the assassination of President John F. Kennedy.

See http://www.foxnews.com/politics/2013/11/22/whats-in-cias-secret-jfk-files/.

On October 16, 2009, the New York Times published a news article about this litigation under the headline, "CIA Still Cagey About Oswald Mystery." Reporter Scott Shane emphasized the findings of the litigation with these words:

> For six years, the agency has fought in federal court to keep secret hundreds of documents from 1963, when an anti-Castro Cuban group it paid clashed publicly with the soon-to-be assassin, Lee Harvey Oswald. The C.I.A. says it is only protecting legitimate secrets. But because of the agency's history of stonewalling assassination inquiries, even researchers with no use for conspiracy thinking question its stance.

The Times also published the photograph, obtained via this litigation, of Joannides receiving the Career Intelligence Medal. See http://www. nytimes.eom/2009/10/17/us/17inquire.htmI?pagewanted=all.

On August 18, 2013, Associated Press reporter David Porter published an article highlighting the result s of this lawsuit, under the headline "Five decades later ,some JFK probe files still sealed."The story begins:

> Five decades after President John F. Kennedy was fatally shot and long after official inquiries ended, thousands of pages of investigative documents remain withheld from public view. The contents of

these files are partially known - and intriguing - and
conspiracy buffs are not the only ones seeking to open
them for a closer look. "Some serious researchers
believe the off-limits files could shed valuable new
light on nagging mysteries of the assassination - including
what U.S. intelligence agencies knew about accused
assassin Lee Harvey Oswald before Nov. 22, 1963.

It turns out that several hundred of the still-classified
pages concern a deceased CIA agent, George Joannides,
whose activities just before the assassination and,
fascinatingly, during a government investigation years later,
have tantalized researchers for years.

The AP also published the photograph of Joannides receiving the

Career Intelligence Medal, which was obtained under this litigation.

Porter's story, which quoted Morley extensively, was published in major

news organizations across the country including, but not limited to:

--the Huffington Post (http://www.huffingtonpost.com/2013/08/17

/jfk-files_n_3773282.html)

--Christian Science Monitor (http://www.csmonitor.com/ USA/

Latest-News-Wires/2013/0817/50-years-later-sealed-JFK-files-still-raise-

questions)

--St. Paul Pioneer Press (http://www.twincities.com/nationaI/ci_

23883822/5-decades-later-some-jfk-probe-files-still)

--Minneapolis Tribune (http://triblive.com/usworld/nation/ 4549872-

74/cia-joannides-conspiracy#axzz2exokV8S0)

--San Jose Mercury News (http://www.mercurynews.com/bay-

arealiving/ci_23884302/5-decades-later-some-jfk-probe-files-still)

--Burlington (Vermont) Free Press

(http://www.burlingtonfreepress.com/viewart/20130817/NEWS04/30817002

2/50-years-later-some-JFK-assassinationfiles-still-sealed)

On August 17, 2013 the British news outlet, the Daily Mail, published

an article about this litigation. The Daily Mail also published a photograph

of Joannides, which was obtained in this lawsuit.

(See http://www.dailymall.co.uk/news/article-2396284/Researchers-

believe-thousands-Kennedy-assassination-files-shed-light-CIA-Oswald-

connection.html)

On November 25, 2013, the Boston Globe reported on the

information revealed by this lawsuit. Reporter Bryan Bender wrote:

> One category of records that researchers are
> anxious to see are the files related to George
> Joannides, a CIA officer who came to public light
> when he served as the agency's liaison to the House
> Select Committee on Assassinations in 1978, which
> concluded the president's death was likely the result
> of a conspiracy.
>
> But what the CIA didn't tell the oversight panel was

> that Joannides had been monitoring Oswald when [he]
> was living in New Orleans prior to the assassination
> and was involved with a series of Cuban exile groups
> with ties to the CIA as well as leftist organizations
> sympathetic to Castro.
>
> It really was an example of treachery," [former
> Assassination Records Review Board chair John]
> Tunheim said in a recent interview of the CIA's
> handling of the Joannides affair. "If [the CIA] fooled
> us on that, they may have fooled us on other things."

(See: http://www.bostonglobe.com/2013/11/25/government-still-

withholding-thousands-documents-jfk-assassination/PvBM2PCgW1H11

vadQ4Wp4H/story.html)

None of these news organizations concurred with the court's unsub-

tantiated claim that Morley had made "inaccurate statements" about the

litigation. To the contrary, every reporter who covered the lawsuit accepted

Morley's bonafides and concurred, with their editorial decisions, that the

public would benefit from knowing about the results of Morley v. CIA.

In evaluating the potential public value of the information sought by

Morley, the District Court employs a variety of techniques aimed at

undermining the value of the disclosures made. Disregarding the "treasure

trove" of records obtained by Morley,[4] he focuses on four particular

documents. Although the District Court concedes "Morley and Davy are

---

[3]See e.g. articles cited in Seventh Declaration of Jefferson Morley, ¶4.

similar plaintiffs in that both sought documents regarding individuals they claimed were related to the Kennedy assassination," it asserts that "the factual circumstances are sufficiently distinct so as to support different conclusions on the public benefit in their respective cases." Morley 2014 at 6. [JA 204] He points to the fact that whereas in Davy no one contested "the fact that the released documents provided 'important new information bearing on the controversy over former District Attorney Jim Garrison's investigation . . .' [h]ere, however, the importance of the new information released as a result of Morley's FOIA request is fiercely contested." Id., citing Def's Opp'n at 8-19.

This is a distinction without a difference. As noted above, the CIA has conceded that the information in these four documents is new, not previously in the public domain. Id. at 9 [JA 207] While the importance of the information may be "fiercely contested," this adds to its value in fostering public examination of information bearing on important national issues. The new information bears heavily on questions concerning CIA deception and the withholding of information about Joannides and his activities from the Warren Commission, the Church Committee, the House Select Committee on Assassinations and the Assassination Records Review Board. Yet on the core issue of the bearing of this new information of

potential value to issues concerning those investigations, the District Court declined to make any finding at all in violation of the remand instructions.

The potential value of the information as adding to the fund of knowledge concerning serious charges of improper and deceitful conduct regarding these investigations has been reflected in the large number of news stories these disclosures have engendered. This value was further enhanced by a recent story in the Boston Globe which linked the Joannides case revelations to the Senate Intelligence Committee's report on torture conducted by the CIA.[5]

Morley believes that under <u>Davy</u> a core issue is not for a District Court to determine the "truth" or "credibility" of a particular document but to determine whether it contributes to the fund of knowledge on a matter of public concern. Nevertheless, he feels compelled to make the following response to the District Court's attempt to make a definitive determination of the "truth" or "value" of the four new documents cited by Morley and the issues relating to them.

<u>Joannides Career Medal</u>

---

[5]<u>See</u>  Bryan Bender, " Answers sought on CIA in 78 JFK probe: Investigators say files could prove interference," The Boston Globe, | October 15, 2014.

With respect to Morley's statement that his lawsuit forced the CIA to disclose that Joannides received a medal for his work in 1963 and 1978, the District Court dismissed this in its 2011 decision, saying that "Morley overstates this medal's importance to his case as in fact this was a 'Career Intelligence Medal' awarded for Joannides's 28 years of service from 1950-1978." Morley 2011 at 264

In its latest decision, the District Court states: "Unfortunately for plaintiff, recognition of 'overall career performance,' Eighth Morley Decl, Attachment 2, upon retirement does not reflect institutional approval of any specific action an employee undertook during that career." Morley 2014 at 8. [JA 806]

This claim overlooks the wording of the citation itself, which states Joannides was honored for 28 years of service "in diverse assignments of increasing responsibility at Headquarters, the domestic field [emphasis added] and overseas." Joannides assignment to Miami in 1962-64 was his only assignment in 'the domestic field" outside of headquarters in his entire career. His chief responsibility during that period, according to his fitness evaluation, was handling the DRE, for which he was highly praised. So the language of the citation can only reflect institutional approval of his

handling of the DRE at the time of the group's contacts with Oswald.

8[th]Morley Declaration [JA 662]

In <u>Morley 2011</u>, the District Court also rejected Morley's argument

that the lawsuit has conferred a public benefit by making it clear that the

CIA retains a significant body of JFK assassination records that it has not

reviewed and released as mandated by the JFK Records Act because (a) they

were properly withheld under the FOIA, and (b) CIA has stated most of

these records are completely unrelated to the Kennedy assassination. 828

F.Supp.2d at 264.

The District Court also erroneously stated that Morley's arguments for

the public benefit of the records obtained via the lawsuit were "based on

nothing more than his own conclusory opinions and factually inaccurate

statements." <u>Morley 2011</u> at 263. <u>Morley 2014</u> essentially hews to this

same line. But in fact, Morley's argument that this material would benefit

the public was ratified by the judgment of the many news organizations

which ran articles about the lawsuit and the information it uncovered,

including the photograph of Joannides obtaining the Career Intelligence

Medal. In every instance, this news coverage raised the question of whether

the documents has been properly withheld and questioned the claim that they

are unrelated to JFK's assassination.

For example:

Prior to this lawsuit "it was not known that. . . Joannides won a Career

Intelligence Medal in 1981." Eighth Declaration of Jefferson Morley ("8th

Morley Decl."), ¶4. [JA 658-659] On this basis alone, disclosure of this

document added measurably to the fund of public knowledge about "what

the government was up to." It had highly honored Joannides for his work.

Morley asserted that "Joannides received this honor in part for his

work in 1963 as case officer for the DRE at the time of its members' contact

with Oswald and for his work in 1978 as the agency's principal coordinator

with the [HSCA]." Id. (emphasis added). He then directly addressed the

CIA's claim: "The CIA says the medal doesn't count as new information

because the honor was for the entirety of Joannides' career, not just the

events of 1963-64, 1978. But since the medal was given for the totality of

Joannides career, it has to reflect the Agency's approval of his conduct as it

related to the JFK assassination issues he dealt with in 1963-64 and 1978."

Id. The District Court disagrees with Morley's assessment, saying that

"[u]nfortunately for plaintiff, recognition of 'overall career performance,'

Eighth Decl. of J. Morley, Attachment 2, upon retirement does not reflect

institutional approval of any specific action an employee undertook during

that career." Morley 2014 at 8 [JA 806] Joannides' Career Intelligence

Medal recognized "his exceptional achievements with the Central

Intelligence Agency for more than twenty-eight years." 8[th] Morley Decl.,

Att. 2. [JA 662-668]  This in itself is a significant matter of public interest to

warrant a finding that the victory in obtaining this information favors an

award of fees under the public benefit factor.  Whether the Career

Intelligence Medal does or does not reflect institutional approval of

Joannides' specific actions during his career is a proper subject for scholars

to study and determine.  Making the record available to the public for study

and evaluation unquestionably confers a public benefit which weighs in

favor of an award of attorney fees.

### Travel Records

Morley obtained two travel documents indicating Joannides may have

travelled to New Orleans at the time when Warren Commission in-

vestigators were interviewing DRE members about their contacts with Lee

Harvey Oswald.  The CIA disputes that they indicate Joannides' presence in

New Orleans on the dates they were signed, the CIA's representations are

based on testimony by its counsel, not by affidavits submitted by

knowledgeable CIA officials under penalty of perjury and based on personal

knowledge.  The forms do indicate that they were intended to be used for

determining travel expenses.  What is clear is that the new information

provided in these forms establishes a previously unknown connection

between Joannides and New Orleans which is unexplained by any other

evidence, such as the presence of relatives there. If, as the CIA claims, he

had an established "Home Leave Residence" in New Orleans, this is

important new information, particularly given the activities of the DRE and

Oswald in the months leading up to the assassination of President Kennedy.

## C. The Second and Third Factors

The District Court simply ratified his previous analysis of the second

and third factors. He lumped the two factors together. In so doing, his

analysis avoided the ineluctable conclusion that the second factor weighed in

Morley's favor. That factor, commercial benefit to the requester, only

applies to requesters in Morley's category—scholars, journalists—if the

interest sought to be promoted is "of a purely commercial or frivolous

nature." Even the CIA conceded that any commercial interest on Morley's

part was minimal. Thus, the District Court clearly erred in finding that this

factor did not support an award of fees.

With respect to the third factor, the nature of Morley's interest in the

records, the District Court ratified its previous finding that Morley had a

personal interest in the records because he obtained search efforts from the

CIA and cheaper copying costs than if he had applied to NARA for the

records. But the CIA was the proper place to make the request because it

had records related to Joannides that were not JFK Act records, as well as

records not retrievable by access to NARA's JFK Act database. More

importantly, by not charging Morley fees, the CIA facilitated the public

interest in disseminating these records widely to the general public. In any

event, any economic benefit accruing to Morley was minimal and far

outweighed by his interest as a scholar and journalist in trying to add to the

fund of information about subjects of great interest to the public.

Both the second and third factors favor Morley, just as they favored

the plaintiff in Davy. The District court clearly erred in ruling otherwise.

D. The Reasonableness of the Agency's Conduct

The CIA's conduct in this case was clearly unreasonable. It was

under a statutory obligation to make a determination of Morley's request

within twenty working days after its receipt. It did not do that until after suit

was filed. Without making any inquiry of Morley, it sought to foist his

request off on another agency, never complying with its obligation to

process the request as submitted until after he filed suit. NARA was not the

"logical repository" of the records requested by Morley as the District Court

found. Morley 2011 at 265. Any examination of the request submitted by

Morley revealed that he had requested many items that were not JFK-

assassination-related and not at NARA in that connection.  See Complaint, Exh. 1.  [JA 28-31]

The District Court upheld the CIA's invocation of the Glomar defense, even though it is now clear that there was no justification for that claim.  As a result, Morley had to litigate that issue all the way to the Court of Appeals.

Because of the CIA's efforts to obstruct and impede ready access to the records Morley requested, the District Court's ruling that the fourth factor supports a denial of attorney fees is also without merit.

## II. THIS COURT SHOULD EXERCISE ITS DE NOVO REVIEW JURISDICTION BY DIRECTLY AWARDING ATTORNEY FEES AND COSTS UPON APPLICATION BY MORLEY

Despite the Supreme Court's admonition against the award of attorney fees becoming a second major litigation, that has occurred here.  This case is now in its sixth year of litigating the attorney fees issue, which is longer than the case on the merits lasted.  This simply repeats the experience of the Davy case, which involved the same District Court Judge, the same defendant, the same plaintiff's counsel and essentially the same legal issues regarding attorney fees.  This experience has been enormously costly to the undersigned counsel in terms of requiring him to spend time litigating the

payment of fees issues rather than expending his efforts on more substantive
FOIA matters.

In <u>Nationwide Building Maintenance, Inc. v. Sampson</u>, 559 F.2d 704
(D.C. Cir. 1977), a question was raised as to whether the Court of Appeals
could make its own discretionary award of attorney fees to a substantially
prevailing plaintiff in a FOIA lawsuit. This Court did not rule that it did not
have the authority to do so, but it decided it was more appropriate to remand
the issue to the District Court for its determination.

This Court possesses authority to determine matters arising under the
Freedom of Information Act <u>de novo</u>. While it is understandable that a
Court of Appeals would ordinarily remand erroneous decisions by the
District Court to it for further action, the circumstances presented here make
that course inadvisable. Having to repeatedly litigate the same facts and
issues over a period of more than half a decade works as powerful
disincentive for attorneys to engage in FOIA litigation. It is notable that
while the FOIA is intended to incentivize FOIA plaintiffs to vindicate their
rights by privately enforcing the FOIA mandate, few attorneys in private
practice specialize in FOIA litigation. The reason is simple. It doesn't pay,
and particularly not promptly. In light of this, this Court should allow

Morley to submit his application for fees directly to it for an award that it sees fit in its discretion.

## CONCLUSION

For the reasons set forth above, the District Court's ruling should be reversed and this Court should rule on the amount of fees to be awarded.


Respectfully submitted

James H. Lesar, #114413
930 Wayne Avenue, Unit 1111
Silver Spring, MD 20910
Phone: (301) 328-5920

Attorney for Appellant

Dated: April 20, 2015


## CERTIFICATE OF SERVICE

I hereby certify that I have this 20th day of April, 2015, electronically served a copy of the Brief for Appellant on AUSA Benton Peterson.


JAMES H. LESAR

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief for appellant complies with the type and volume limitations set for FRAP 32(a)(7)(B)(i). It contains 9,196 words.

JAMES H. LESAR